NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0347n.06

Case Nos. 25-5321/5466

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE |
| JAMAL J. GARDNER, | ) ) | |
| Defendant-Appellant, | ) ) | OPINION |
| | ) | |

Before: SUTTON, Chief Judge, GRIFFIN, and NALBANDIAN, Circuit Judges.

**NALBANDIAN, Circuit Judge.** Jamal Gardner ambushed police from one of his properties in Columbia, Tennessee. He fled to Michigan after an hours-long shootout, and investigators discovered five firearms, blood stains, and Gardner's DNA at the property. Gardner turned himself in to Michigan police without further violence. And a jury convicted him of being a felon in possession of a firearm. Because he had three previous cocaine-related convictions in Tennessee, the district court applied the Armed Career Criminal Act's (ACCA), 18 U.S.C. § 924(e), 15-year statutory minimum and imposed a within-Guidelines sentence of 360 months' imprisonment. Gardner appeals, arguing that the government violated his due-process rights by failing to preserve potentially exculpatory evidence and that his prior, state convictions don't qualify under ACCA. We disagree, so we affirm.

**I.**

The dramatic events leading up to this appeal began with a love story, of sorts, and ended with a police cruiser peppered by gunfire. The jury that convicted Jamal Gardner heard that story as told below.

Gardner wanted to win back Tristaca Harlan, the mother of four of his children. They'd known each other for over 20 years, but she moved out of their shared home in 2018.

Two episodes of Gardner's quest underlie this case. The first stretched from the night of January 12, 2019, into the early morning hours of the next day. Gardner's daughters (who live with their mother) called the police that night after he started "calling, saying all kinds of crazy things, [and] telling [his] daughters what he was going to do." R.113, Trial Tr. Vol. II, PageID 673. He'd also visited their apartment, "stat[ing] that he wanted to be with his mom, who was deceased." R.111, Trial Tr. Vol. I, PageID 534–35. And he'd texted Harlan to inform her that "[t]onight is [the] night" and that she "play[ed] with [his] emotions for the last time." R.113, PageID 679. Making things even more ominous, he texted her photos of himself with guns and a bulletproof vest. After the police arrived at Harlan's apartment, Gardner called again. The assemblage at the apartment told him that he was on speakerphone talking with the police, to which he responded—as captured on an officer's bodycam footage—that "he didn't care." R.111, PageID 536. And to prove it, he went ahead and told the crew that he was "cocked and loaded," "on his way back to the residence," and that he planned to "shoot it out or be killed himself." *Id.* None of that came to pass—at least not that night.

Gardner's words met action three weeks later. On February 2, 2019, he visited Harlan's apartment twice. The first visit, in the daytime, went normally enough—he just showed up and told Harlan that he was there to see his kids. But Gardner came back at night, when Harlan was

2

alone. And that visit didn't go so inconspicuously. This time, Gardner—evidently drunk, in Harlan's telling—began punching her in the back of the head. That went on for a few minutes until Harlan broke free and fled the apartment. She then called the police, informing them what happened and that Gardner had fled in a yellow Dodge Ram truck. After skipping the scene, Gardner texted Harlan that he was "drunk" and "can't see," and that she should "tell the police" that he was "ready to [be] sen[t]" to his mother. R.113, PageID 686. Apologizing that he wasn't "a better man for [Harlan]," Gardner let her know he had hidden "$8,000 . . . under the rug" at his house. *Id.* "That's yours." *Id.*

At nearly the same time that Gardner texted Harlan his grim goodbye, another 911 caller reported a reckless driver in a yellow Dodge Ram truck. Officer Steven Schmidt responded to the call and soon encountered a truck matching both the 911 caller's and Harlan's description. As he followed the truck, he observed it swerve into oncoming traffic, but "gave [the driver] a chance that maybe there may have been an object in the roadway that he was trying to avoid." *Id.* at PageID 707. The tail lasted until the truck pulled into a driveway. Or, more accurately, overshot the driveway and successfully parked only after three rounds of driving into and backing up out of surrounding shrubs and trees. At that point, Schmidt believed he'd seen enough evidence of reckless driving to initiate a traffic stop. So he parked his cruiser at the driveway's entrance, its headlights pointed toward the back of the truck at an angle.

After Schmidt parked behind the truck and activated his blue lights, things went south in a hurry. The events that followed are captured in Schmidt's bodycam footage—but not his cruiser's dashcam, an issue that we'll explore later—which the jury viewed as Schmidt narrated from the witness stand. As he got out of his car, Schmidt saw the truck's driver's side door open and a "large black male" standing next to it. *Id.* at PageID 715. And "[a]s soon as" he shone his

3

flashlight on the man to get a better look, Schmidt saw the man holding "what [Schmidt] knew to be an AR-15 type rifle." *Id.* at PageID 716. The man immediately fired shots at Schmidt. Fearing for his life, Schmidt took shelter behind his squad car and fired five or six rounds back at his assailant. The shooter retreated into the house, and other officers joined the fray to back Schmidt up. As the officers and the unknown assailant traded gunfire, Schmidt's bodycam caught the shooter yelling at them to "[d]ig a hole motherfuckers. I'm going to see my momma tonight." *Id.* at PageID 723. At trial, Harlan identified the screaming voice as Gardner's. Once officers could safely enter the home, they found it empty.

After the dust settled by the following morning, officers executed a search warrant on the residence. It turned out to be a property owned by Gardner. And the yellow truck was Gardner's too. Officers found four guns—a shotgun and three rifles—each of which bore Gardner's DNA. They found bloodstains, too—also with Gardner's DNA.

And Gardner himself turned up soon after. After the shooting, he had fled to Michigan to stay with a cousin. He told his cousin that he'd "shot at the police in Tennessee." *Id.* at PageID 849. And in the process of turning himself in with his cousin's help, he told investigators that "you-all shot me, but it's all good." R.114, Trial Tr. Vol. III, PageID 979. Gardner surrendered to authorities in Detroit less than a week after the shooting, on February 8, 2019.

A grand jury indicted Gardner on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). It also charged that he had three preexisting convictions for crimes qualifying under the Armed Career Criminals Act (ACCA), 18 U.S.C. § 924(e), subjecting him to a heightened mandatory minimum sentence.

At trial, the jury heard the evidence described above. And Gardner—as was his right—opted not to put on a defense. But before charging the jury, the district court heard argument and

4

granted Gardner's request to sanction the government for failing to preserve the dashcam footage from Schmidt's police cruiser and disclose it to Gardner before trial. To that end, the court instructed the jury that it could infer the footage was favorable to Gardner if it found that the government was at least negligent in failing to preserve it. Even with that instruction, the jury returned a guilty verdict.

On top of finding him guilty, the jury found that Gardner's three prior cocaine convictions occurred on "occasions different from one another," fulfilling one of ACCA's requirements to engage the heightened mandatory minimum sentence for career criminals. The jury verdict form enumerated the three prior offenses it found triggered the ACCA mandatory minimum provision. Once in 1996, again in 1998, and a third time in 2012, Gardner pleaded guilty to state charges for selling or possessing with intent to sell at least 0.5 grams of cocaine.

At sentencing, the district court considered whether Gardner's previous offenses qualified as "serious drug offense[s]" under ACCA. To do so, the court considered whether the Tennessee statute of conviction underlying Gardner's previous convictions entailed the same elements as the definition of a serious drug offense under the federal law. Over Gardner's objections, the court concluded that they did. So it sentenced him to 360 months' imprisonment.

Gardner appealed,[1] raising two arguments for us to consider. First, he raises—for the first time—a claim that the government violated his due-process right to exculpatory evidence by failing to preserve Schmidt's dashcam footage. Second, he argues that the Tennessee statute under which his previous drug convictions arose is categorically broader than the "serious drug

---

[1] Gardner filed two notices of appeal "out of an abundance of caution" because the district court filed an amended judgment clearing up a "clerical error" in the original. So even though his appeal is docketed under two case numbers, we functionally have before us only one judgment in one case.

offense[s]" defined by ACCA, rendering convictions under that statute unusable as ACCA predicates. We're unconvinced, so we affirm.

## II.

## A.

Gardner's first argument on appeal is that the government violated his due-process right to exculpatory evidence by failing to preserve and produce dashcam footage from Schmidt's cruiser. The district court already sanctioned that error with an adverse-inference jury instruction. Gardner now argues—for the first time—that the district court didn't go far enough. He requests either vacatur of his conviction and a bar on further prosecution, or a new trial where the government is further penalized with an order excluding its DNA evidence. The government didn't breach Gardner's due-process rights, so we reject his request.

When a defendant fails to make a due-process argument before the district court,[2] "we will only consider it [on appeal] if the case is exceptional or if refusing to consider it would produce a plain miscarriage of justice." *United States v. Edge*, 989 F.2d 871, 876 (6th Cir. 1993) (per curiam) (citation modified). Gardner's briefing doesn't mention that hurdle, let alone explain why his case clears it. For that reason alone, we could find his due-process argument forfeited and decline to address its merits.

---

[2] Gardner argued for—and won—a spoliation instruction directing the jury to take an adverse inference against the government if it found that "the government negligently, recklessly, or intentionally failed to preserve evidence or otherwise made it unavailable." R.115, Trial Tr. Vol. IV, PageID 1238–39. But that wasn't a *Youngblood* due-process argument of the sort Gardner makes here. *See Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988). Indeed, it couldn't have been, since negligence on the government's part can't rise to the level of a due-process violation under *Youngblood*—but it *can* warrant a spoliation sanction.

Even so, we'll explain why Gardner's due-process argument fails.  The Supreme Court's due-process caselaw "has developed what might loosely be called the area of constitutionally guaranteed access to evidence."  *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996) (citation modified).  Under that umbrella fall two categories of evidence to which defendants are entitled: "material exculpatory evidence," and "evidentiary material of which no more can be said than that it *could*" be beneficial to the defense.  *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988) (emphasis added); *see also United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001).  Different rubrics apply to alleged failures to provide either type of evidence.  *See Wright*, 260 F.3d at 570.

Here, Gardner argues only that the dashcam footage was "potentially exculpatory," Appellant Br., p.15, so we analyze his arguments under the standard laid out by the Supreme Court in *Youngblood*.  There, the Court explained that defendants must "show bad faith on the part of the police" in failing to preserve the potentially exculpatory evidence to avoid "imposing on the police an undifferentiated and absolute duty" to retain "materials whose contents are unknown and, very often, disputed."  *Youngblood*, 488 U.S. at 58 (citation modified).  But "bad faith alone" isn't sufficient.  *Wright*, 260 F.3d at 571.  We've specified that command with a three-part test. The defendant must show "(1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means."  *Jobson*, 102 F.3d at 218.

Gardner's *Youngblood* due-process argument flounders on the first element.  To show bad faith, a "defendant must prove 'official animus' or a 'conscious effort to suppress exculpatory evidence.'"  *Id.* (citation modified).  "And, where the government is negligent, even grossly negligent, . . . the bad faith requirement is not satisfied."  *Wright*, 260 F.3d at 571.  Gardner hasn't

pointed to any evidence showing that the government intentionally failed to preserve the dashcam footage. Instead, his arguments sound in negligence: the officers *could* have recovered the footage from the police cruiser, so they *should* have. A patrol officer and a detective either implied or outright stated in their testimony that the dashcam wasn't destroyed in the shootout and that the police cruiser apparently retained sufficient function to extract the footage. That may be enough to warrant a spoliation instruction—which the district court issued, and in the face of which the jury still found Gardner guilty—but not enough to find a due-process violation. *See id.*

And in any case, Gardner arguably forfeited his due-process claim entirely by failing to present any argument on the other two required elements.[3] *See Lyons v. Mich. Dep't of Corr.*, 812 F. App'x 305, 308 (6th Cir. 2020) (finding that an appellant forfeited a claim where he failed to present any argument as to one of its required elements on appeal and the appellee contested that element).

Gardner's counterargument fails to persuade. He argues that a defendant can show bad faith by proving that "the circumstances under which the evidence is discarded negate any innocent explanation for the government's conduct." Appellant Br., p.16 (quoting *United States v. Soriano*, 401 F. Supp. 3d 396, 401 (E.D.N.Y. 2019)). But the language he quotes simply confirms what we

---

[3] In any event, we doubt that Gardner could succeed on the second element—exculpatory value—even if he'd tried. He's presented no proof, beyond "mere speculation," that the dashcam footage had apparent exculpatory value at the time it was destroyed. *See Jobson*, 102 F.3d at 219 (quoting *Jones v. McCaughtry*, 965 F.2d 473, 479 (7th Cir. 1992)). He offers only the bare assertion that the footage would show another person emerging from the yellow Ram truck and shooting at Officer Schmidt. But that's especially difficult to credit in light of all the other facts that the jury found tied Gardner to the scene. It was his house; his truck (which, by the way, his girlfriend had only minutes before reported him driving); his voice captured on Officer Schmidt's bodycam footage repeating his mantra of wanting to see his mother; his DNA on the recovered guns and bloodstains; and his admission to officers upon turning himself in that they shot him. Faced with all that, and without any proof from Gardner that the dashcam footage would show something drastically different, we can't conclude that it'd have *any* exculpatory value, let alone exculpatory value apparent to the government at the time it lost or destroyed the footage.

already know from binding Sixth Circuit precedent: the burden on a defendant to show bad faith is high, such that other courts require (in the absence of direct proof animus or intent) proof that there isn't "*any* innocent explanation" for the spoliation. *Id.* (emphasis added). Gardner flips that on its head by faulting the government for failing to affirmatively prove an innocent explanation on its own. We're unconvinced by that attempt to broaden the bad-faith standard by misreading out-of-circuit caselaw.

So because Gardner failed to carry his burden to prove the government's bad faith, we have no occasion to remand with instructions to institute the severe sanctions he seeks.

**B.**

Turn to the second issue before us today: whether Gardner's previous convictions for drug crimes in violation of Tenn. Code Ann. § 39-17-417 qualify as "serious drug offense[s]" under ACCA's three-strikes regime.

We've answered that question in the affirmative in another case before this panel, *United States v. Starling*, No. 25-5440 (6th Cir. Aug. 3, 2026). The same attorneys briefed the same issue the same way in both cases. So our analysis in *Starling* maps directly onto this case.[4] *See id.*, slip op. at 5–13. Instead of duplicating *Starling*, we incorporate by reference its reasoning about why a conviction under Tenn. Code Ann. § 39-17-417(c)(1) qualifies as a "serious drug offense" for ACCA purposes.

---

[4] The only difference worth noting is that some of Gardner's offenses involve older versions of Tennessee's criminal laws than those we analyzed in *Starling*. But the intervening amendments didn't change anything that would alter the way our analysis in *Starling* applies here. The relevant drug schedule remained materially the same over those years. *Compare* Tenn. Code Ann. § 39-17-408(b)(4) (1989), *with id.* (2003). As did the penalty provision. *Compare id.* § 39-17-417 (1989), *with id.* (2003). So we can incorporate *Starling*'s statutory analysis without modification.

**III.**

For the foregoing reasons, we affirm.